J-A04017-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JOHN M. BREWER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JEANNIE M. BREWER | : | |
| | : | |
| Appellant | : | No. 1170 MDA 2024 |

Appeal from the Order Entered July 22, 2024
In the Court of Common Pleas of York County Civil Division at No(s):
2013-FC-002022-03

BEFORE:  LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED JUNE 17, 2025**

Appellant Jeannie M. Brewer (Mother) appeals from a custody order directing her to engage with a new therapist, to be selected by a stipulated reunification coordinator, for treatment towards the goal of reunifying Appellee John M. Brewer (Father) with the parties' child, P.B. (Child), born in May of 2012.  We affirm.

By way of background, Mother and Father separated when Child was one and a half years old.  After the parties' separation, Child resided with Mother pursuant to a stipulated custody order.  **See** Custody Stipulation, 12/4/13.  In December of 2020, Mother obtained a temporary Protection From Abuse (PFA)[1] order against Father on behalf of both herself and Child.  **See** N.T., 7/17/24, at 81.  On January 15, 2021, Mother and Father entered into a

_____

[1] 23 Pa.C.S. §§ 6101-6122.

final PFA order "by agreement and without admissions." ***Id.***; ***see also*** Interim Custody Order, 6/28/22, at 5. On May 5, 2021, the PFA court extended the duration of the final PFA order to January 15, 2029, because Father had twice been found in indirect criminal contempt (ICC) for violating the terms of the PFA order. ***See*** Mother's Conciliation Conf. Mem., 6/14/22, Attach., at 1 (extended PFA order, 5/5/21); ***see also*** Custody Stipulation, 10/6/23. The extended PFA order provided that Father was "prohibited from having ANY CONTACT with [Child] either directly or indirectly, at any location, including . . . [Child's school] . . . for the duration of this order." ***Id.*** at 2.

The trial court entered the parties' joint stipulations as custody orders on January 19, 2023 and October 6, 2023. These orders kept in place the no-contact provisions of the extended PFA order and provided that "Father's custody of Child is suspended other than at reunification counseling . . . or at . . . supervised visits." ***E.g.***, Custody Order, 1/19/23, Ex. A at 2 (unpaginated) ("Joint Stipulation, 1/19/23").

The Joint Stipulation, 1/19/23, provided that Pamela Moran, a licensed social worker, would oversee the parties' "reunification counseling with Child[;]" and, further, that the parties "shall follow the recommendation of the reunification counselor as to the timing and conditions for supervised visitation[,]" "execute any authorization necessary for [] communication with [Child's] counselor[,]" and "cooperate with the counselor and therapist." ***Id.*** Upon "successful completion of the reunification[,]" Father could commence supervised visits with Child. ***Id.*** at 3 (unpaginated).

The October 6, 2023 stipulated order also set forth a process for Father's reunification with Child, including therapy for the parties. Specifically, the parties agreed that Lynn Brooks, MS, MFT, would provide therapeutic supervision for visitation between Child and Father and also reunification counseling if needed. Custody Order, 10/6/23, Ex. A at 2 (unpaginated) ("Joint Stipulation, 10/6/23"). Therein, Mother agreed to "participate in individual therapy with [] Becky Yutzy, MFT" and "in the exchange of information." *Id.* This order also provided that

> [a] coordinator of the reunification process should be assigned to coordinate the reunification process including assuring that information is exchanged amongst providers as ethically permitted, treatment is coordinated, **specific treatment objectives and goals are being addressed**, and information is being report[ed] to the parties and his or her attorney for updates or recommendations as needed.

*Id.* (some formatting altered and emphasis added). The parties agreed to "sign releases of information for all treatment providers to coordinate services." *Id.* at 3 (unpaginated).

On January 31, 2024, Father filed a petition for special relief alleging that Mother had violated the terms of the Joint Stipulation, 10/6/23. Therein, Father alleged that Mother had refused to sign the form authorizing Child's therapist to release the records of Child's supervised visitation session with Father to [Ms.] Moran" and "impermissibly altered the authorizations for [Mother's] therapist (Becky Yutzy) and [Child's] therapist [], in a way that was inconsistent with the [stipulated order] and . . . that impermissibly limits the

information that can be provided to [Ms. Moran], interfering with her efforts at reunification." Father's Pet. Spec. Relief, 1/31/24, at 3.

On February 7, 2024, the Honorable N. Christopher Menges heard Father's special relief petition of January 31, 2024. The record reflects that by the time of this hearing, Mother had consented to Ms. Brooks releasing information regarding "treatment plan" and "treatment progress" for the purpose of "exchange of information for reunification" to Ms. Moran. Exhibits, 2/7/24, M-3, at 5.[2] Mother also signed a consent form to permit Ms. Yutzky to release "psychological evaluation" information for the purpose of "exchange of information for reunification[,]" but crossed out some language in the form and attached an addendum limiting the information to be released to "solely . . . whether [Mother] is in counseling [], and whether treatment has ended, and her psychological evaluation." *Id.* at 6-7. In this attachment, Mother declined to "waive the psychotherapist-patient privilege and confidentiality" with Ms. Yutzky. *Id.* at 7.

After the hearing, Judge Menges entered a temporary order granting Father interim relief and "clarif[ying the] stipulated order already in effect[.]" Interim Order, 2/8/24, at 1, 4. Therein, Judge Menges stated that "[n]othing

_____

[2] We note that, while the exhibits from the February 7, 2024 hearing are included in the certified record, the transcript of this hearing is not part of the record. We remind Mother that it is her responsibility as the appellant to ensure a complete record for our review. *See* Pa.R.A.P. 1921, Note ("[u]ltimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials").

- 4 -

could be clearer [than] that Mother is not fully cooperating with the reunification process set forth in the custody stipulation." *Id.* at 1.

Judge Menges' interim order directed Mother to provide a release without any "cross-outs" or "exceptions[,]" and "trust[ed] that [Ms.] Moran is not going to be asking for personal mental health information except as necessary for the reunification counseling." *Id.* at 2. Noting that the parties had themselves chosen Ms. Moran and the therapists, Judge Menges reminded Mother that she had agreed to "always cooperate with the reunification counseling as set forth by [Ms.] Moran[,]" and warned that "[f]or Mother to try to hide behind her mental health [HIPAA] rights to impede this process is not going to be tolerated by the [trial court] since she waived those by entering into the stipulation." *Id.* at 3. The trial court found that Mother "has been dilatory and impeded [the reunification] process" and ordered Mother to pay Father $1,000 in attorney's fees. *Id.* at 3-4.

On June 5, 2024, Father filed a petition for special relief seeking, *inter alia*, sole legal and physical custody of Child and requesting that Mother be held in contempt. **See** Father's Pet. Spec. Relief, 6/5/24, at 5. Therein, Father alleged that he "dropped off cupcakes and balloons to the main office of [Child's] school on her birthday[]" and that, in response, "Mother initiated an ICC against Father[.]" *Id.* at 3. Father also alleged that after the cupcake incident, at a supervised therapeutic visitation session on May 30, 2024, "Mother stated to [the therapist], in front of [Child] that, 'Father lies all the time.'" *Id.*

On June 10, 2024, Mother filed an answer to Father's special relief petition in which she denied Father's allegations and responded that she had not initiated a private complaint against Father but, rather, that "[a]s a result of Father's appearing at the school, Mother called [township police, . . . and the county district attorney] then initiated the ICC proceedings." Mother's Ans. to Father's Pet., 6/10/24, at 1. Mother also responded that on May 30, 2024, Child was "put out" on the session date "because she had to forfeit a visit with her friends to the park for ice cream[]" to attend therapy with Father. *Id.*

On June 24 2024 and July 17, 2024, when Child was twelve years old, the trial court held hearings on Father's petition for special relief. At that time, the trial court heard testimony from Michele Miele, Psy.D., the therapist who was at that time providing reunification counseling for Child and Father, and Ms. Moran, the parties' reunification coordinator. The trial court accepted Dr. Miele as an expert in reunification counseling and clinical psychology and accepted Ms. Moran as an expert in alienation reunification. *See* N.T., 6/24/24, at 16-18; N.T., 7/17/24, at 70-71, 119.[3]

_____

[3] The trial court qualified Ms. Moran as an expert in her "respective fields[,]" and later referred to "Ms. Moran's expertise in alienation." N.T., 7/17/24, at 70-71.

Father's counsel characterized Ms. Moran's testimony regarding her qualifications as establishing "that she's an expert in alienation reunification." N.T., 7/17/24, at 70. Further, Dr. Miele testified that she and Ms. Moran were
*(Footnote Continued Next Page)*

Dr. Miele testified that she had conducted nine therapeutic reunification sessions with Father and Child and that she had attempted to draw Mother into these joint sessions but Mother had refused, stating "I am not ready for that." N.T., 6/24/24, at 20-23. Dr. Miele testified that she had no safety concerns for Child around Father. *See id.* at 24-25, 29-30. Dr. Miele testified that Mother was not alienating Child from Father but also that Child feels that "if she chooses to have a relationship with [Father,]" that she is being disloyal or betraying Mother by doing so. *Id.* at 37-39, 51, 56, 66; N.T., 7/17/24, at 28.

With regard to Mother reporting Father for a PFA violation after the cupcake incident, Dr. Miele conceded that Mother's conduct caused a regression in the reunification process and was "alienating behavior[.]" N.T., 7/17/24, at 35.[4] Dr. Miele testified that Father and Child "have been separated way too long because now [Child] has built up [a] wall of resistance

_____

both members of a "reunification alliance committee." N.T., 6/24/24, at 33-34.

Mother's counsel objected that Ms. Moran was not "qualified to make the recommendations that she did in her report[,]" and renewed this objection and asked that "she be removed[,]" after the trial court accepted Ms. Moran as an expert. N.T., 7/17/24, at 70, 72. The trial court denied the motion to remove Ms. Moran from the case. *Id.* at 72-73.

Based on the foregoing, the record appears to reflect that Ms. Moran was accepted by the trial court as an expert on alienation reunification. We note that it is helpful to our review for the trial court to specify the field of expertise upon accepting a witness as an expert. *See generally* Pa.R.E. 702.

[4] Dr. Miele made this concession in response to the trial court's questions.

towards [Father]" and that "[Mother] is not being abusive, but she could be discouraging [Father's] involvement [with Child.]" N.T., 6/24/24, at 48, 57.

In response to a hypothetical question concerning a progression in visitation between Father and Child, Dr. Miele testified that

> if [Mother] tells [Child that spending time with Father is fine], that is golden, that is all you really need, really honestly, in this whole process. Once parents get past their conflicts and [Mother] started to say, no, go have a good time, you will be fine. Like, you don't want [Father] to be a monster to [Child], right, then [Child] thinks she is a monster."

*Id.* at 62.

The parties' reunification coordinator, Ms. Moran, testified that

> [c]oncerning [Mother], to me there's clear alienating behaviors in terms of the limiting of time with [Father]. I mean, that's clear, and it continues. . . . When we're looking at parent alienating behaviors, we're not necessarily looking at the number of alienating behaviors but the severity . . . [F]or several years now there is a pattern of [Mother] limiting [Child's] contact with [Father] and taking measures to limit that . . . or not allow it at all through various means. . . . Research says that 48 percent of the time PFA[s] and false allegations of abuse are used as part of the alienating process, and I believe that may be the case in this case.

N.T., 7/17/24, at 50-51.

In a report that Ms. Moran had prepared for the trial court, she noted that Father and Child had not had unsupervised contact since April 5, 2021 and that "[Child] seemed to tell the story of [Mother] and [Father's] relationship [], more than the relationship between [Child] and [Father]." Reunification Counseling Rpt., 6/15/23, at 3. Ms. Moran recounted her

attempts to engage with Mother about how to respond to events like the cupcake incident in the future to avoid regression in the reunification process and suggested that before reporting a PFA violation "if [Mother] had concerns, she would talk with the reunification therapist or myself about that so that we could prevent it getting to that point again." N.T., 7/17/24, at 51. Ms. Moran reported that in response to this suggestion Mother stated that "it's her duty to report anything that's in violation of the PFA[]" and that should something similar happen again "she would call her attorney to seek to report that[.]" N.T., 7/17/24, at 52-53.

Ms. Moran testified that, while Mother was free to utilize "whatever therapist she chooses to see for her own personal therapy[; b]ut . . . we are here because of parent/child contact issues, and I would identify it very much as parent alienation, and so we are treating parent alienation." *Id.* at 54.

With regard to Mother's current therapist, Ms. Moran testified that

my concern is that [Ms. Yutzky] does not appear to have the knowledge, expertise, and so forth, or comfort level, to address [alienation] or to work with the [trial court] on that, and that . . . the same thing that Dr. Miele had discussed about the idea sometimes there's an alignment between the client and the therapist. And we need a therapist who really understands these high conflict issues and how to treat parent alienation or minimally understands the dynamics so that they can get some direction on the treatment and be open to doing that and able to do that. . . [Ms. Yutzky] believes that [Mother] needs treatment for domestic violence and trauma and not beyond that. So my concern is that she's not addressing the issues that we need addressed to move treatment and progress forward. . . . [R]esearch indicates it's really important that parents receive treatment, the favored parent receives treatment. That is treatment for these

parent/child -- parent contact issues, refusal dynamics, things like that.

*Id.* at 54-55. Ms. Moran testified that Ms. Yutzky is "telling me she's not going to address those issues." *Id.* at 63. Ms. Moran also testified that, while Dr. Miele desired to proceed towards reunification at a pace that would be "perfectly comfortable" for Child, when addressing "the dynamics of parent alienation . . . we need to recognize that [Child is] not going to be . . . perfectly comfortable. . . . She is definitely [going to be] awkward because it's [a] loyalty conflict." *Id.* at 58-59.

Mother testified that prior to the cupcake incident, Father had been "stalking" Mother and Child by "driving past our house . . . on a dead end road" and "sitting in parking lots watching us[,]" but did not, however, report these alleged PFA violations because "I don't have a camera." *Id.* at 88, 104. Mother also testified that, "in some ways I feel [the reunification process] just moves too fast[]" and that Child should not be "just [thrown] into it." *Id.* at 97.

The trial court found that Dr. Miele's testimony demonstrated that Child "is conflicted . . . between her need to reunify with [Father] but also be true to [Mother]" and that the reunification process was "taking far too long[.]" *Id.* at 63, 71. The trial court noted that Dr. Miele saw her role as "to be neutral and support both sides." *Id.* at 32. The trial court also noted that Mother "exercised her discretion to report some but not all [of Father's]

alleged [PFA] violations." *Id.* at 106. Ultimately, the trial court found that Mother's conduct was alienating and that Child is

> a very conflicted, loyalty conflicted [child] who is trying to not upset the emotional apple car[t] where she lives [with] Mother . . . And it is not normal to not have a relationship with your father unless [] there's safety concerns. . . . And . . . the ICC [for violation of the PFA] unfortunately did cause a diminishment in the progress that was made with [Child].

*Id.* at 66-67; *see also id.* at 117.

At the conclusion of the hearing, the trial court issued an order reiterating Judge Menges' prior finding "that [Mother] has engaged in alienation behavior" and concluding that Father had "met his burden of proof[.]" Trial Ct. Order, 7/22/24, at 2. Therein, the trial court found "credible Ms. Moran's concerns that [Mother] is not receiving the reunification treatment goals and objectives that are necessary to further the reunification between [Father] and [Child,]" and directed

> Ms. Moran to select an individual therapist so that [Mother] can proceed with the goals and objectives for reunification[, which specifically] shall address alienation by [Mother] with [Child] as the victim. . . . Mother is . . . free to continue with her individualized therapy with Ms. Yutzky.
>
> *     *     *
>
> Further, although the [trial court] has . . . found [Mother] in contempt, the [trial court] is choosing not to impose any sanctions on Mother. The parties are again reminded that we must make progress in the reunification and that time is of the essence.

*Id.* at 4-6.

Mother filed a timely notice of appeal on August 19, 2024, and a Pa.R.A.P. 1925(b) statement the following day.[5] The trial court issued a Pa.R.A.P. 1925(a) opinion addressing Mother's claims.

On September 9, 2024, this Court issued a rule to show cause why the appeal should not be quashed as interlocutory. Mother responded that the trial court's order was a final order that disposed of all claims between the parties and that the trial court had imposed sanctions after finding Mother in contempt, notwithstanding the wording of the trial court's order. *See* Mother's Resp. to Rule, 9/19/24, at 1-10 (unpaginated). This Court discharged the rule to show cause, but quashed the appeal with respect to the contempt finding. *See* Order Discharging Rule to Show Cause, 10/23/24.

On appeal, Mother presents the following issues, which we reorder as follows:

_____

[5] We note that in a children's fast track appeal, "a concise statement of errors complained of on appeal as described in Pa.R.A.P. 1925(a)(2) shall be filed with the notice of appeal and served on the trial judge in accordance with Pa.R.A.P. 906(a)(2)." *See* Pa.R.A.P. 1925(a)(2)(i). Here, Father requested that this Court quash Mother's appeal because Mother did not comply with Rule 1925(a)(2)(i). *See* Father's Resp. to Rule, 9/19/24, at 1.

However, although Mother filed her concise statement one day late, it does not run contrary to an order of this Court or of the trial court, and no party raised any allegation of prejudice. *See In re K.T.E.L.*, 983 A.2d 745, 747-48 (Pa. Super. 2009) (declining to quash appeal where the appellant filed a concise statement after the notice of appeal, but the late filing did not prejudice other parties and facilitated "the presumed purpose. . . to expedite the disposition of children's fast track cases"). Therefore, we decline to quash Mother's appeal or find her claims waived on this basis.

1. Whether the trial court erred in holding Mother in contempt of the court's order of October 23, 2024.

2. Whether the trial court erred in holding it "previously found that Mother has engaged in alienation behavior."

3. Whether the trial court violated Mother's rights when it compelled Mother to change her individual mental health counselor over Mother's objection and contrary to the protections afforded to Mother under the United States Constitution, the Pennsylvania Constitution, Pennsylvania law, Mother's privacy and mental health rights.

4. Whether the [trial] court violated Mother's rights by ordering a third party to choose a new individual therapist for Mother.

5. Whether the trial court erred or abused its discretion in ordering a social worker's goals and objectives as mandates upon Mother's therapist in violation of Pennsylvania statutes.

Mother's Brief at 4 (some formatting altered).

**Contempt**

In her first issue, Mother argues that the trial court erred in holding her in contempt. *Id.* at 32-45. Mother also contends that the trial court's contempt order was a final and appealable order because the trial court imposed a sanction on her when it required her to engage in reunification and parental alienation therapy, "notwithstanding the wording in the [trial court's] order." *Id.* at 41-42, 44 (citations omitted).

As stated above, this Court previously concluded that "the portion of the Order finding [Mother] in contempt" was not a final, appealable order because the trial court did not impose any sanctions on Mother. Order Discharging Rule to Show Cause, 10/23/24, 1-2 (unpaginated); *see also Hanbicki v. Leader*, 294 A.3d 1234, 1239 (Pa. Super. 2023) (stating that "[t]his Court

- 13 -

has held that a contempt order is final and appealable if the order contains (1) a present finding of contempt and (2) an imposition of sanctions[]"); *Genovese v. Genovese*, 550 A.2d 1021, 1023 (Pa. Super. 1988) (holding that an order of contempt is final and appealable when the order contains a present finding of contempt and imposes sanctions).

The Child Custody Act (the Act) enumerates specific sanctions that a trial court may impose after finding a party in contempt of a custody order. *See* 23 Pa.C.S. § 5323(g)(1). Here, the trial court's contempt finding was not accompanied by any of the sanctions listed in Section 5323(g)(1) and, accordingly, the trial court's requirement that Mother engage in reunification and alienation therapy is not a sanction in custody. *See Hanbicki*, 294 A.3d at 1239; *Genovese*, 550 A.2d at 1023. Therefore, to the extent Mother continues to challenge the contempt finding on appeal, we see no reason to disturb this Court's prior order quashing Mother's appeal with respect to that issue.

**Parental Alienation**

Mother also challenges the trial court's finding that, based on Judge Menges' prior order and Mother's refusal to release her mental health records, Mother had engaged in alienation behavior. *See* Mother's Brief at 29-32. Mother claims that Judge Menges did not make a prior finding that Mother had engaged in parental alienation. *Id.* at 31. Mother also contends that "the Mental Health Procedures Act, her privilege with her mental health counselors (42 Pa.C.S. § 5944), and those protections afforded under caselaw[]"

establish her right to "request not to have her personal mental health information from her private counselor provided to the reunification coordinator." *Id.* at 31-32. Mother therefore concludes that her "non-compliance" does not "constitute[] parental alienation." *See id.* at 31.

In reviewing custody matters,

> our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law[] or are unreasonable in light of the sustainable findings of the trial court.

*E.R. v. J.N.B.*, 129 A.3d 521, 527 (Pa. Super. 2015) (citation omitted); *see also R.L. v. M.A.*, 209 A.3d 391, 395 (Pa. Super. 2019) (explaining that "a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will" (citation omitted and formatting altered)). We apply a deferential standard of review to claims of abuse of discretion, as it is not this Court's role to "re-find facts, re-weigh evidence, and re-assess credibility." *Wilson v. Smyers*, 284 A.3d 509, 520 (Pa. Super. 2022) (citation omitted).

The paramount concern in any custody case is the best interests of the child. *See* 23 Pa.C.S. §§ 5328(a), 5338(a). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral[,] and spiritual well-being." *Taylor v. Smith*, 302 A.3d 203, 207 (Pa. Super. 2023) (citation omitted).

Here, the trial court explained that

Mother's first claim of error is that this [c]ourt erred in holding that we had previously found Mother to have engaged in alienation behavior. For the following reasons, we disagree.

To begin, we acknowledge stating the following: "The court has previously found that [M]other has engaged in alienation behavior and those prior findings are noted." [Trial Ct. Order., 7/22/24, at 2]. However, we believe Mother is being too myopic about the case. On February 7, 2024, our colleague, [Judge] Menges, entered an order addressing an earlier special relief petition by Father. In the order resolving that matter, Judge Menges stated: "Nothing could be clearer that Mother is not fully cooperating with the reunification process set forth in the custody stipulation." [Interim Relief Order, 2/8/24, at 1]. Though during an earlier action within the custody case, Judge Menges' pronouncement was made close in time to the present action. Insofar as custody matters go, from that February statement until the June filing of the current special relief petition, Father was immediately complaining about Mother's continued alienation of [Child] from Father.

Judge Menges, a judge of coordinate jurisdiction, stated, in this custody case, "[n]othing could be clearer," but that Mother was not fully cooperating with reunification. This is part of the *res gestae* of this case. And, though Judge Menges did not state alienation in explicit terms, the effect of his pronouncement was tantamount to a finding of alienation. Simply stating the word "alienation" should not have talismanic power; but, rather, the clear intent of our colleague was a finding of alienation. Judge Menges is part of the bench that has presided over this case.

- 16 -

> Thus, our statement that, "[t]he court has previously found that mother has engaged in alienation behavior and those prior findings are noted," was accurate. Further, it is the court's practice to review, *inter-alia*, all prior orders in each case prior to proceeding in a pending matter.

Trial Ct. Op., 9/18/24, at 11-12 (some citations omitted and formatting altered).

Following our review of the record, we find no abuse of discretion or error of law by the trial court. ***See E.R.***, 129 A.3d at 527; ***see also R.L.***, 209 A.3d at 395. As noted, the record is replete with evidence that Mother engaged in alienating behavior and that the trial court credited the evidence of Mother's alienating behavior.

Specifically, Dr. Miele testified that Child "has built up [a] wall of resistance towards [Father]" and that "Mother . . . could be discouraging [Father's] involvement [with Child.]" N.T., 6/24/24, at 48, 57. Dr. Miele testified that if Mother tells Child that spending time with Father is fine that "that is all you really need, really honestly, in this whole process." ***Id.*** at 62. Dr. Miele conceded that Mother's behavior in the cupcake incident was "alienating behavior." N.T., 7/17/24, at 35. Further, Ms. Moran, the parties' reunification coordinator, who was also qualified as an expert on alienation and reunification in custody matters, testified that Mother was engaged in alienation behaviors and that Mother was not making progress towards reunification in her treatment with Ms. Yutzky. ***Id.*** at 50-55, 63. The trial court expressly credited Ms. Moran's concerns. ***Id.*** at 122 ("the [trial] court does find credible Ms. Moran's concerns"). For these reasons, we conclude

- 17 -

that Mother is not entitled to relief. **See E.R.**, 129 A.3d at 527; **see also R.L.**, 209 A.3d at 395.

**Appointment of Therapist**

In her remaining claims, Mother challenges the trial court's decision to appoint her a new therapist to facilitate Father's reunification with Child. Specifically, Mother argues that mandating that she work with a mental health therapist not of her choice violates her "right to privacy based on Article I, Section 1 of the Pennsylvania Constitution[,]" which "guarantee[s her] privacy interests] . . . from disclosure of personal matters . . . and to make certain important decisions." Mother's Brief at 45-47. Mother contends that while a trial court may order a parent to undergo a psychological evaluation in a custody proceeding that this authority does not extend to ordering a parent to engage in therapy. **Id.** at 46, incorporating **id.** at 43-44. Mother characterizes the trial court's requirement that she engage with a new therapist as "permission to violate a party's thoughts" and that "the **right to protect one's beliefs and thoughts from intrusion by others is . . . one of the most comprehensive rights known to civilized men**." **Id.** at 46 (emphasis in original).

Mother also argues that allowing Ms. Moran to select Mother's new therapist is beyond the trial court's scope of authority pursuant to 23 Pa.C.S. § 5328, which sets forth the factors to be considered when awarding custody, and Pa.R.C.P. 1915.8, which addresses when mental examinations may be ordered in custody proceedings. **Id.** at 47-48. Mother contends that the trial

court's directive amounts to "involuntary . . . treatment" and that she has a right to choose her therapist "for purposes of the custody matter" pursuant to her Due Process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 8 of the Pennsylvania Constitution. *Id.* at 48-49.

Finally, Mother claims that the trial court erred in imposing "mandates" on Mother based on Ms. Moran's recommendations because Ms. Moran is not "a licensed **clinical** social worker" and, therefore, such clinical recommendations are "outside her scope of [social work] practice" as set forth in 63 P.S. § 1903. *Id.* at 51-55 (emphasis in original). Mother contends that the trial court does not have "the authority to ignore the limitations of [Ms.] Moran's permissible scope of practice because[,] in its opinion, doing so serves the best interest of [Child,] as such reasoning would conceivably permit a court to order **anything** it deems in a child's best interests[.]" *Id.* at 55 (emphasis in original).

With regard to the authority to order parties to engage with psychological or therapeutic services, the Act provides that, "as part of a custody order, [a court may] require the parties to attend counseling sessions[,]" although "[i]n situations involving abuse, the court . . . may not order the parties to attend joint counseling." 23 Pa.C.S. § 5333(a), (b). Further, Section 5340 of the Act references a trial court's authority to "appoint[] a licensed behavioral health practitioner . . . to assist the court by conducting an examination or evaluation of the parties involved or making a

recommendation concerning a child custody agreement or order[.]" 23 Pa.C.S. § 5340.[6]

Further, in family law matters where the parties have entered into a stipulated agreement and a trial court has adopted that agreement as an order, "[a] party who has acquiesced in an order or judgment will not later be heard to challenge it." *Miller v. Miller*, 744 A.2d 778, 783 (Pa. Super 1999) (citation omitted), *see also Pereira v. Leite*, 679 EDA 2023, 2024 WL 808715, *2 (Pa. Super. filed Feb. 27, 2024) (unpublished mem.) (same).[7]

Here, the trial court explained that

pursuant to 23 Pa.C.S.[] § 5333(a), "[t]he court may, as part of a custody order, requi[r]e the parties to attend counseling sessions." Insofar as Mother's right to choose her own counselor, we have reviewed the custody portion of the Domestic Relations Code. While the **divorce** section states that "[t]he choice of a qualified professional shall be at the option of the parties, and the professional need not be selected from the list provided by the court," 23 Pa.C.S.[] § 3302(e), the same does not appear to be true of the **custody** section.

\* \* \*

To whatever extent Mother might respond that the appointment of a health care or behavioral health practitioner in a custody matter must be made by choice of the party to be evaluated, we

_____

[6] Section 5340 of the Act addresses liability for licensed health care and behavioral health care practitioners who provide services in custody matters pursuant to a court appointment; this section does not operate to establish a trial court's authority to make such appointments. For purposes of determining the outer contours of the trial court's authority on this question, however, the statutory language, "in which the court has appointed . . . [,]" acknowledges the trial court's ability to make such appointments. *See id.*

[7] We may cite to non-published decisions of this Court filed after May 1, 2019 for their persuasive value. *See* Pa.R.A.P. 126(b).

- 20 -

would respond that the chapter on divorce is direct as to the appointment of counselors; if the legislature intended to forbid custody courts from choosing appointed counselors then they would have been similarly direct. 1 Pa.C.S.[] § 1921 (b) ("Where the words of as statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). . . .

[T]he "best interests of the child" standard is the lodestar of child custody cases. To wit, remembering Dr. Miele's testimony that Father and [Child] had been separated for too long, we acknowledged that time was of the essence and stated the following:

> The parties are reminded that whatever the past is between the two of them, and it is a sordid and painful past, [Child's] actions, as reported by Dr. Miele, indicate that [Child] is a loyalty conflicted 12-year-old child and that is not healthy. So again the best interest of the child are our guide star, and we must move carefully but nevertheless diligently forward. The court also notes that [Child], based on the long history of conflict and alienation in this case; is going to be resistant to those changes, but **the court believes that the biggest and best catalyst for change will be Mother herself**.

[Trial Ct. Order., 7/22/24, at 6] (emphasis added).

\* \* \*

This is a case in which Mother has successfully and repeatedly stymied progress towards reunification between Father and [Child].

While not ignoring Mother's, and, frankly, all parties' and the Court's, desire to protect [Child], Mother's attempts to blunt the progress of reunification, by fashioning her own counseling into a shield, if not a sword, must be overcome for the betterment of all parties. Though Mother clearly believes that she is protecting herself **and** [Child] under the aegis of Mother's mental health rights, Mother's assertion of a right to the counselor of her choice has been just one segment in a Gordian Knot that has frustrated [Child's] best interests. By appointing a counselor, we simply sought to cut through that knot for, above all, the sake of [Child]. For all of the foregoing reasons, we did not err as alleged.

- 21 -

* * *

[I]n dispensing with an earlier special petition by Father, Judge Menges stated the following:

> Th[is] court did not choose the coordinator or the therapist that were chosen by parties or counsel. **For Mother to try to hide behind her mental health [HIPAA] rights to impede this process is not going to be tolerated by the court since she waived those by entering into the stipulation**. And the court makes a specific finding that Mother has been dilatory and has impeded this process, which is very vital to Father and [] Child. Accordingly, Mother will cooperate with Pam Moran and with all the other mental health professionals involved and will not in any way impede or delay this process again.

[Interim Order, 2/8/24, at 3].

* * *

> Clearly, this court sought to further the reunification that Judge Menges' address of the case had been unable to achieve due to Mother's intransigence. [Child's] best interests **required** this court to shepherd Mother towards reunification, which, . . . Dr. Miele had opined had dragged on for too long and resulted in Father and [Child] being apart for too long. The vehicle to accomplish this was the very reunification coordinator **that Mother had agreed to and had subordinated her rights to** in October of 2023.

Trial Ct. Op., 9/18/24, at 17-22 (some citations omitted, some formatting altered, and emphases in original).

Following our review of the record, we discern no abuse of discretion or error of law in requiring Mother to engage in therapy to facilitate Child's reunification with Father, a mandate imposed by the trial court in pursuit of Child's best interests and congruent with the terms of the Joint Stipulations.

*See* 23 Pa.C.S. § 5333(a);[8] *see also Taylor*, 302 A.3d at 207; Joint Stipulations, 1/19/23 and 10/6/23.

In her brief, Mother's does not address the interplay of her individual privacy and due process rights with Child's best interests and her voluntary assent to the provisions set forth in the Joint Stipulations. As Mother has failed to develop her argument, we find this issue waived. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating that "[w]here an appellate brief . . . fails to develop the issue in any other meaningful fashion capable of review, that claim is waived" (citations omitted)). In any event, the record reflects that, although the trial court ordered Mother to engage with a new therapist for purposes of facilitating Child's reunification with Father, this directive does not prevent Mother from continuing therapy with Ms. Yutzky. Therefore, the trial court has not compelled Mother to change her therapist as Mother claims.

Lastly, we discern no abuse of discretion or error of law in the trial court's decision to adopt Ms. Moran's recommendations regarding changes to Mother's individual therapy as contemplated by the Joint Stipulation, 10/6/23.

---

[8] To the extent Mother claims that the trial court lacked the authority to order her to attend therapy with a new therapist based on 23 Pa.C.S. § 5328 and Pa.R.C.P. 1915.8, her reliance is misplaced. Neither Section 5328, which governs the award of legal and physical custody rights to a child, nor Pa.R.C.P. 1915.8, concerning mental health examinations, apply here. Instead, 23 Pa.C.S. § 5333(a), which permits a court to require a party in a custody proceeding to attend counseling, controls. *See* 23 Pa.C.S. § 5333(a) (stating "[t]he court may, as part of a custody order, require the parties to attend counseling sessions)."

The record confirms that Mother consented to Ms. Moran serving as the parties' reunification coordinator, with the concomitant powers granted by the parties themselves by stipulation. **See** Joint Stipulation, 10/6/23, at 2 (unpaginated). The mandate of a reunification coordinator under this Joint Stipulation was to "assur[e] that . . . specific treatment objectives and goals are being addressed[.]" **Id.** As Mother assented to the reunification process, including oversight of her individual therapy by a reunification coordinator, Mother voluntarily subordinated her right to make unrestricted choices regarding her therapy for the purposes of this custody matter.

The trial court was well within its discretion to conclude that Ms. Moran's scope of authority as reunification coordinator included making recommendations to ensure that "specific treatment objectives and goals are being addressed." **Id.** Accordingly, Ms. Moran's recommendation – that Mother engage with a new therapist to support Child's progress toward reunification with Father – falls squarely within the ambit of the authority and duty of the reunification coordinator as set forth in the Joint Stipulation. **See id.**; **see also** N.T., 7/17/24, at 52-54; **see also Miller**, 744 A.2d at 783; **Pereira**, 2024 WL 808715 at *3.

Therefore, Mother is not entitled to relief on her claims concerning the court-mandated changes to her therapy to advance the reunification process. **See Miller**, 744 A.2d at 783; **Pereira**, 2024 WL 808715, at *2. For these reasons, we affirm.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>06/17/2025</u>